McFADDIN EXPRESS, INCORPORAT-
ED, L & L Leasing Corporation and
Louis DeBeradinis, Jr., Plaintiffs-Appel-
lants,

v.

The ADLEY CORPORATION, Michael L.
Adley, Donald A. Adley, Ralph J. Ad-
ley and Daniel J. Adley, Defendants-Ap-
pellees,

and

United States of America,
Defendant.

No. 452, Docket 29529.

United States Court of Appeals
Second Circuit.

Argued April 28, 1965.

Decided June 7, 1965.

Tobias Weiss, Stamford, Conn., for
plaintiffs-appellants.

Joseph P. Cooney, Hartford, Conn.
(John F. Scully, Hartford, Conn., of coun-
sel), for defendants-appellees.

Before LUMBARD, Chief Judge, and
WATERMAN and FRIENDLY, Circuit
Judges.

FRIENDLY, Circuit Judge.

In this action in the District Court for
Connecticut between citizens of that
state, plaintiffs sought to establish fed-
eral question jurisdiction under various

sections of the Judicial Code, notably 28 U.S.C. §§ 1331, 1336, and 1337, see also 49 U.S.C. § 16(12). Judge Blumenfeld, in a well-reasoned opinion, 240 F.Supp. 791 (1965), decided that the effort had not succeeded and dismissed the complaint. We agree with his disposition.

The complaint alleged the making of two contracts, as of April 20, 1959, relating to McFaddin Express, Incorporated, a motor carrier holding a certificate from the Interstate Commerce Commission, and L & L Leasing Corporation, which leased equipment to it. One contract provided for the sale of all the stock of the two corporations to The Adley Corporation, also a certificated motor carrier; the other provided for temporary management and control of McFaddin and L & L by Adley for a period of 180 days from the effective date of an order of the ICC authorizing the contract "or to such earlier or later date as shall be ordered by said Commission, and unless otherwise ordered by said Commission until a final order is made by said Commission" with regard to the sale. The contract of sale was subject to ICC approval of the management contract in accordance with 49 U.S.C. § 310a(b), and ultimate approval of the sale itself as required by 49 U.S.C. § 5. Appropriate applications were made to the ICC which, on May 21, 1959, issued an order, later extended, approving the temporary management contract. Serious disagreements occurred between the parties, federal tax liens on McFaddin's property were foreclosed, and McFaddin's service became largely dormant. In a report dated Oct. 15, 1963, the ICC denied

approval, 93 M.C.C. 378,[1] and the management contract terminated in August, 1964.

The complaint charged, *inter alia*, that during the term of the management contract the defendants failed to pay current federal taxes and to comply with an agreement McFaddin had made for the discharge of past delinquencies; that at the time the contracts were made, defendants did not intend to comply with them in good faith; that they had mismanaged McFaddin and L & L, both deliberately and negligently, had diverted the former's business to their own account, had induced creditors to repossess assets of McFaddin, had appropriated assets of McFaddin and L & L, had terminated the employment of McFaddin's employees and hired some of them for Adley, had failed to segregate revenues or funds belonging to McFaddin and L & L, and had failed on the expiration of the management contract to return the property and business of McFaddin and L & L as the contract required. The first count of the complaint alleged in conclusory terms that the mismanagement and return of the corporations in their damaged state violated the ICC order approving the management contract. Reasserting the same facts, further counts set forth theories of fraud, constructive trust, and breach of contract. Damages and certain equitable relief were requested.

■ In testing the complaint for sufficient assertion of a federal question, we apply, *faute de mieux*, the approach utilized with respect to 28 U.S.C. § 1338

1. Approval had earlier been denied in a report, 87 M.C.C. 665 (1961), which stated that because of certain disputes over the contract, Adley had sought denial of its own application. Noting that "it is well established by Commission precedent that matters of controversy arising between the parties under private contracts must be left for settlement by the parties themselves or by the courts," 87 M.C.C. at 667, the Commission denied the application on the grounds that the acquisition would weaken Adley and would deprive shippers of competition. On further hearing Adley reversed its position

and urged approval as a means of aborting the threatened litigation by McFaddin and its owners. Repeating that "this longstanding controversy is * * * a matter for the courts to decide if the parties cannot otherwise resolve the controverted matters," 93 M.C.C. at 382, the Commission again denied approval, this time largely on the basis "that it would not be consistent with the public interest to permit a carrier to purchase dormant operating rights which it intends to hold and possibly institute operations thereunder at some future time." 93 M.C.C. at 384.

in T. B. Harms Co. v. Eliscu, 339 F.2d 823, 826–828 (2 Cir. 1964), cert. denied, 85 S.Ct. 1534 (1965), namely, whether the complaint is for a remedy expressly granted by an act of Congress or otherwise "inferred" from federal law, or whether a properly pleaded "state-created" claim itself presents a "pivotal question of federal law," for example because an act of Congress must be construed or " 'federal common law' govern[s] some disputed aspect" of the claim. Compare ALI, Study of the Division of Jurisdiction Between State and Federal Courts 33 (Tent. Draft No. 3, 1965). Harms' exegesis of the "arising under" language in 28 U.S.C. § 1338 is well suited to the similarly worded §§ 1331 and 1337; the more specific jurisdictional warrant of § 1336—to bring in federal court any civil action to enforce an ICC order— merely poses the subsumed question whether a particular federal remedy embraces the facts here pleaded and can be discussed at the same time.

■ If the complaint could fairly be read as asserting a substantial claim of violation of the ICC order approving the temporary management contract, the case could arguably go forward as one mandated by 49 U.S.C. § 16(12) "for the enforcement of such order," with jurisdiction squarely founded on 28 U.S.C. § 1336; or alternatively, the suit might take shape as one for an implied federal remedy for breach of the express federal duty raised by the ICC order, see Note, 77 Harv.L.Rev. 285 (1963), and so arguably meet the jurisdictional requirements of § 1331 or perhaps § 1337. There might still be some difficulty on either line of reasoning—on the first, for example, because McFaddin might be said to seek not so much enforcement of an order as com-

pensation for past disobedience, and on the second, because "implication" of a federal remedy is hardly automatic, particularly where an agency occupies the field. But such questions need not be resolved, for we do not think that the ICC "ordered" Adley to obey the management contract.

The critical language of the initial order of May 21, 1959, which is set out in the margin,[2] states that Adley is "authorized" to take control. The order is permissive only, in effect granting a temporary exemption from the prohibition of 49 U.S.C. § 5. If Adley had never assumed the permitted temporary control, it would have violated its contract but not the order. And if Adley did control McFaddin other than "upon the terms and conditions set forth in the agreement filed with the application," perhaps Adley forfeited its exemption from § 5,[3] but again it has disobeyed no express command of the ICC. Doubtless the Commission does expect that a carrier authorized to exercise temporary control will use this permission in accordance with its agreement, so as to enable the controlled carrier to resume independent operation if approval under § 5 is ultimately denied. But we do not feel justified in reading the bland language of the order so that these expectations become ICC commands, especially when the Commission has been at such pains to make clear that it considers the private disagreements of the parties not to be its concern, see fn. 1.

■ The only other suggestion of a federal question is that the national interest in contracts such as the present ones is so great that "federal principles control the disposition of the claim," T. B. Harms v. Eliscu, supra, 339 F.2d at

2. "*It is ordered,* That the said application under section 210a(b) be, and it is hereby granted, and that The Adley Express Company be, and it is hereby authorized to control McFaddin Express, Inc. through management, for a period not exceeding 180 days, beginning with the date hereof, unless otherwise ordered, upon the terms and conditions set forth in

the agreement filed with the application under section 210a(b), but at a compensation payable to The Adley Express Company, and its employees and agents of not exceeding $1.00 per year."

3. McFaddin does not suggest that § 5 has been violated, or that its present injuries would be compensable on that theory, and we do not consider the question.

828, which would otherwise be governed by state law. Accepting that application of "federal principles" would bring the suit within 28 U.S.C. § 1331 on the theory that "the 'laws' referred to in the statute are not confined to Acts of Congress, but include also such 'federal common law' as may exist," ALI, supra, at 34; see Kurland, The Romero Case and Some Problems of Federal Jurisdiction, 73 Harv.L.Rev. 817, 827–33 (1960),[4] we cannot find that plaintiffs have here shown that federal principles should supersede state law in any respect relevant to this case. That the contracts could not lawfully be carried out save with ICC approval does not, without more, demonstrate that Congress meant all aspects of their performance or non-performance to be governed by law to be fashioned by federal courts rather than by the state law applicable to similar contracts relating to businesses not under federal regulation. This is not to say that a particular issue concerning such a contract, e. g., whether ICC approval had or had not been granted prior to a particular date, cf. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), would not require determination under federal principles. But the complaint does not suggest that any such issue is present here. On this point we must agree with Chicago & No. W. Ry. v. Toledo, P. & W. R. R., 217 F.Supp. 64 (S.D.Ill.), aff'd, 324 F.2d 936 (7 Cir. 1963), rather than with what was stated as an alternative ground for decision in Florida East Coast Ry. v. Jacksonville Terminal Co., 328 F.2d 720, 722 (5 Cir.), cert. denied, 379 U.S. 830, 85 S.Ct. 59, 13 L.Ed.2d 38 (1964). International Ass'n of Machinists v. Central Airlines, Inc., 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed. 2d 67 (1963), which appellants strongly press upon us as sustaining federal jurisdiction, is not truly apposite; the general language on which they rely, 372 U.S. at 692, 83 S.Ct. 956, must be read in the light of the Court's statements that Congress had made it a statutory duty of the parties to establish the airline system board of adjustments whose award was sought to be enforced, 372 U.S. at 690, 83 S.Ct. 956, and that, although created by private contract, the Board was intended " 'to be and to act as a public agency, not as a private go-between,' " 372 U.S. at 695, 83 S.Ct. at 964. Pan American Petroleum Corp. v. Superior Court, 366 U.S. 656, 81 S.Ct. 1303, 6 L. Ed.2d 584 (1961), denying federal jurisdiction, is closer to the case in hand.

■ On the basis of the reasons and authority cited in T. B. Harms Co. v. Eliscu, supra, 339 F.2d at 828–829, we also uphold Judge Blumenfeld's refusal to entertain the claims under state law on a theory of "pendent jurisdiction." As has recently been written, "Where the federal element which is the basis for jurisdiction is disposed of early in the case, as on the pleadings, it smacks of the tail wagging the dog to continue with a federal hearing of the state claim." ALI, supra, at 59.

Affirmed.

4. What we said in In re Chicago Express, Inc., 332 F.2d 276, 279 (2 Cir. 1964), does not argue to the contrary. Relying in part on narrow statutory evidence, we were there construing a provision of the Bankruptcy Act, not the jurisdictional grant of the Act of March 3, 1875, 18 Stat. 470. Furthermore, despite common reference to the rule of Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339 (1879), there at issue, as "federal," that rule was not in fact one where "the source of the substantive rule * * * is national authority." Kurland, supra, 73 Harv.L.Rev. at 833. It has long been settled that "a case does not arise under the laws of the United States simply because this court, or any other federal court, has decided in another suit the questions of law which are involved." Leather Mfrs. Bank v. Cooper, 120 U.S. 778, 781, 7 S.Ct. 777, 778, 30 L.Ed. 816 (1887).